Good morning, Your Honors. May it please the Court, Ashley All for the United States. With the Court's permission, I will try to reserve three minutes for rebuttal. Sure. Feel free to adjust, readjust the microphone if that... I've been told not to touch them, so I'm not going to touch them. She just told you you could. You can. You can. Thank you. The District Court's order dismissing the indictment in this case must be reversed. Indeed, peculiarly, that appears to be the result that the District Court itself anticipated. Defendants have strained to characterize this case otherwise, but it involves a straightforward sting operation in which a confidential informant and an ATF undercover officer purchased real weapons from capable, enthusiastic, and judged by their own words, experienced street dealers. The government then charged those dealers with straightforwardly exactly what they did, which is dealing in firearms without a license, conspiring to do the same thing, and possessing weapons as felons. And there is simply no way consistent with this Court's precedent to conclude that that operation was constitutionally outrageous. As a matter of high-level logic, that's an impossible result to reach because this Court has found much more exotic and candidly morally questionable investigations not to be outrageous. And this Court hasn't affirmed a finding of outrageous government conduct in 45 years. This cannot be the case in which it does so. And I respect defense counsel's efforts to support the District Court's order in this case, but they simply haven't done so based on an accurate representation of the record. Instead, it's based on some mix of speculation without support in the record and ignoring facts that are in the record. Notably, they've claimed that there was a flood of weapons introduced into Compton. There is no evidence supporting that claim at all. They've similarly said that the defendants... This was, what, 57 guns over a 16-month period? Fifty-nine guns, Your Honor. They've similarly said that the defendants had never done this before, which ignores the objective evidence available to the ATF, including the defendants' own statements, that they were experienced, they knew what was going on, and that they had this established pipeline that was fairly sophisticated for acquiring weapons from out of state. Fairly sophisticated? Pardon me, Your Honor? Go to a pawn shop in Arizona? It wasn't just going to a pawn shop in Arizona. The CIA testified that the defendants mentioned using fake IDs to do so. When they were arrested in October of 2015 on their way to Arizona, pardon me, in Arizona, they had in their car multiple thumb drives, some gift cards, indications that are consistent with what the CIA understood was that there was some sort of fake ID aspect to the operation. And I would submit that that is fairly sophisticated. The whole point of going to Arizona, presumably, is to avoid the California restrictions on the number of firearms you can buy at a particular time, which is why, of course, street value is higher in general. And so I would submit that that is at least relatively straightforward. Pardon me, relatively sophisticated as a means of acquiring multiple weapons for sale. Did the defendants meet any of the factors in the Black decision in the government's view? They do, Your Honor. So the Black decision, the first three factors in the Black decision that look to the defendant's characteristics, the first is known criminal characteristics of the defendant. Here there was gang affiliation. The government was going after a particular gang in a particular place. Defendants were thought to be associates of that gang. Similarly, they were introduced as affiliates of other gun dealers that the government was already dealing with, so they came into the investigation as gun dealers, not as unknowns. And after the government encountered each of them, this is at GER 135 and 141, the government did immediately run their criminal histories. And so it did, by the time it continued to engage with them, know their history. Similarly, individualized suspicion, Black itself says two relevant things about that. One is that it can be directed towards a group or a category of people. That's in Black at page 304. And that's exactly what happened here. The CI witnessed all of this crime, including firearm-related crime, conducted by a particular gang. Then the ATF initiated its investigation of that gang, of which defendants were thought to be members. Similarly, the government doesn't need individualized suspicion, or pardon me, the lack of individualized suspicion with respect to individuals can be overcome by defendants' assertions effectively about their predisposition, which was abundant here. And then finally, the government's role in creating the crime was entirely different from as in Black. This was not a creatively manufactured, inchoate crime, attempting to recruit people for a fake stash house robbery. The government merely solicited. The government CI said, I'm interested in buying guns, and then whoever came to sell guns to him, he dealt with. What I didn't understand was why didn't the district judge see this as the same thing as going out and buying drugs from street peddlers of narcotics? I don't see the difference. I share Your Honor's confusion. I believe it is the same. The government went out and offered to buy a commoditized, albeit illegal product, and then dealt with people that appeared as dealers of that product. I don't think there's a way to conclude that that is constitutionally outrageous. And finally, we've taken the unusual step of requesting reassignment here, which is something that I do with significant hesitation, but I do think the standard is met here. The court came to a similar conclusion recently in both Dunlap, which involved the same district judge, and in Flores, which involved a different district judge from the central district. And the factors that are most weighty to me are, first, there is indication on the record that the court would have trouble following this court's dictates. The court indicated that it hated controlling authority. And more subtly, by releasing the defendants without making findings, the court contravened this court's exact order that it do so in Dunlap from just a few years ago, where after a flurry of emergency motions, the government obtained an order from this court requiring the same district judge not to do exactly what he did here, which is release defendants without any findings. And then, as we've emphasized, there are comments on the record that overall indicate that the appearance of justice would be better served by remand to a different district judge. Well, let me ask you about that. It seems to me that Dunlap was a stronger case for reassigning to a different judge because in Dunlap the judge said that, and I'll quote, I have it on pretty good terms and from a pretty good source that Dunlap probably isn't looking at a lot of time, obviously referring to himself, right? Yes, Your Honor. Okay. That didn't happen here. That's absolutely true. I wouldn't dispute that that specific thing didn't happen. The record in Dunlap was, in fact, much broader. That is the one thing that was mentioned in the ultimate order reassigning. I would actually submit that the case here is stronger than in Dunlap. My office litigated Dunlap. For instance, in Dunlap the court did issue a very lengthy written order that while it led with a citation to the black dissent, did at least purport to apply the black factors. Nothing like that happened here. The court didn't even really give lip service to black. It said it hated it, and it invited reversal from this court. If that doesn't satisfy a standard for at least serving the appearance of justice to remand to a different district judge, I'm not sure what would. Well, just because you disagree with circuit authority doesn't mean you can't apply it. I mean, that happens every week in my job. I agree, Your Honor, but the court not only said that it hated it, it then didn't apply it. In fact, it reached a conclusion that, in my view, is entirely incompatible with black, and it didn't even purport to do so. It didn't, as in Dunlap, issue a lengthy written order at least trying to go through the factors. It made some statements about how offensive the government's conduct was and then issued a one-line order saying that it was dismissing for the reasons stated on the record, which were those comments about offensiveness and shamefulness. So I would submit that there is at least an appearance of injustice and that that would justify a remand to a different district judge. May I ask one additional question? Of course. It's uncontroverted in the record that the CI moved to Compton not to assist the government. I find that hard to believe. And even though it's uncontroverted, we don't have to accept the CI's testimony that he moved to Compton for what, for family reasons? The testimony is, factually, the testimony is most laid out in the testimony from the HILT trial. And what I gather from that is that the CI had moved out of the area, was unhappy there, and then decided to move back to the Los Angeles area for, as you said, family reasons. Legally, I do think in the absence of a factual finding by the district court, the standard of review does require this court to construe the record in favor of the government. That makes the most sense, whereas here there's dry records for the most part indicating what the CI's reasons for moving back were. He did also testify to that effect live, but there weren't any findings, so there's no way for this court to apply clear error review. And so I would submit, given the standard of review, this court actually does have to take that as true as part of its construal of the record in favor of the government, the non-moving party here. If the court has no further questions, I will retain my 15 seconds for rebuttal. We'll put a minute on the clock. Thank you. Good morning, Your Honors. Alexandra Yates on behalf of Mr. Pickett. I plan to spend about six minutes arguing and then turn it over to Mr. Newman for the balance. Let me articulate for the court precisely why the district court got it right in this case. So in black over a forceful dissent, the two-judge majority said there was no outrageous government conduct but clearly suggested that it was a somewhat close case. Now here, the same factors that we'd against the government in black are present in terms of individualized suspicion, known criminal characteristics, whether there was an ongoing offense. The CI testified point blank he had seen no evidence of firearms trafficking at all before this operation began. You don't think that the government had any reason to suspect that the Crips were dealing in firearms in Compton? No, Your Honor. The only testimony, the only evidence in the ROIs and the only testimony was that there was evidence that there were guns present and being used in improper ways. Well, like in street robberies and drive-by shootings and, you know, all the things that gangs do. Absolutely. I don't understand your argument. Are you saying ATF had no reason to be going to Compton? Well, two points, Your Honor. First of all, when we're talking Compton or a neighborhood broadly, I think that's a fairly wide net that we're going to cast. Well, we all know it's a rough part of town and that there's a lot of crime there involving weapons. I would respectfully suggest that it might be unwise to authorize ATF investigations just based on whole neighborhoods of trolling. You've got a history of violent crimes? I mean, this is one of the highest crime rate areas in the Los Angeles metropolitan area. What more does? It is getting better. It is getting better? Okay, I'm glad to hear that. There's hope. Not to dispute that there was gun violence, but gun trafficking. We have the Second Amendment in this country. There's no evidence articulated in the record that there were unlawful gun sales happening. And that is what ATF targeted. What do you do about the argument Ms. Hall made about the false IDs, the thumb drives? Well, that, of course, came many months down the line once there had been not only inducements but also these ongoing transactions. The question in this court was very clear not only in Black but the later Pedrin case that's cited in the briefs that what the government learns only after the fact can't supply the individualized suspicion necessary to justify the sting if the government only had little or no basis for the individualized suspicion beforehand. So this all came much further down the road. And if the court notes in the record, although there were, according to the CI, a couple of people who had come by before the sting was started who had said things like, we can get you guns, we can get you drugs, we can get you whatever, those were not these defendants. And, in fact, when the CI initially These defendants were introduced to the CI by the person that the CI first contacted. Isn't that right? Well, I don't believe that's the case, Your Honor. I don't think it's clear from the record whether Smith, the third co-defendant in this case, is actually one of the people who had made those comments to the CI. But in any event, when the CI first started trying to transact with Smith, it actually took him some time to produce a gun. The CI was trying to do this. He didn't have a ready pipeline. Was it Smith who had the guns at his house and did one of the transactions at his house? Had one gun. That's correct, Your Honor. Well, Counsel, what do you think the district court meant when it said, we can do better than this, and this is my ruling, and the Ninth Circuit will set it right? Can that be read as anything other than an acknowledgment that the circuit case law is basically tough on the ruling under these circumstances? I'm not unsympathetic to his concern and frustration, to some extent, given the way that the schemes are carried out. You can question whether this was that law enforcement should do better in Judge Wright's words. But he did say the Ninth Circuit would set it right, and the case law doesn't seem too favorable to dismissal under these circumstances. I think the case law is favorable, and I'd like to address that in a moment. But as to Judge Wright's comments, I'm not sure how familiar the court is with Judge Wright. He has a very colloquial, one might say informal, interesting way of speaking. He calls them as he sees them. So some of the comments that might appear jarring, I don't think are specific animus. But when he says the Ninth Circuit will set it right, knowing him, I can only read that one way, which is, well. And I don't take it as animus towards the case law. He did say that he hates the applicable case. But knowing him, I can certainly imagine him saying the Ninth Circuit was set right. I just don't know what he means by that. So I think a fair interpretation of that would be to say that he's acknowledging the case law is pretty tough for his ruling. Or that he thought it would be affirmed. Fair enough. Very good, Your Honor. I agree. And, of course, that's the other interpretation. I like that interpretation, Your Honor. If there are two possible interpretations, we have to go one way. We acknowledge that the case law is difficult, but I do want to emphasize the black case says that this is a close case. I do think that the first three factors, as in black, favor the defendants here. There are other factors that are stronger here. The inducement, the duration of the government's involvement, the need for the investigative technique, and then on top of that. But how is this different? Let me ask you the same question I asked Ms. Hall. How is this different from the government sending a C.I. or an undercover agent out on the street in a narcotics investigation to solicit the purchase of drugs? It's quite different, Your Honor, because here what there was evidence of was that these defendants were doing narcotics deals. And so had they sent the C.I. to do that, we'd have a very different case. There was no evidence that these defendants or, in fact, anyone I would suggest. But wasn't there evidence that came out through admissions by some of the participants that they had done other transactions? In fact, there was one transaction involving an AK-47 where they were saying, look, you better buy it from me at this price because I've got another buyer that's otherwise going to purchase that. After they'd gotten into the deal. That's right. So I don't think that's legally relevant under Black and Pedrin. But also in that particular AK-47 situation, they said that, but then it's clear they didn't really have anybody else because they kept coming back to the C.I. And, in fact, days or weeks later, whatever it was, still had not sold that. But if the concern here is that we're entrapping otherwise innocent drug dealers into committing federal firearms violations, what's outrageous about a person who's otherwise predisposed to violate the law and to see if he'll not only sell drugs but also guns? I'd like to answer Your Honor's question, and then I don't want to eat into my co-counsel's time anymore. Answer that question and then save the remaining time for Mr. Newman. Thank you. I'm anxious to jump up and participate. Here's the extra factor here that goes beyond Black in the other cases. And, of course, Black says it's not an exhaustive list. The extra factor here is that the ATF agents did create a pipeline. There is no evidence that anybody was bringing in guns into this neighborhood from Arizona, from pawn shops, before this case. The agents did apparently create that, bringing this new pipeline of guns into a poor neighborhood where that didn't exist before. That is outrageous. That is largely what the district court relied on. And that distinguishes this case from all of the others that the government cites. It involves a known violent criminal street gang? But not a gang that was known to be involved in gun trafficking. And I do want to allow Mr. Newman some time. All right. Thank you, Your Honors. Let's put four minutes on the clock. Thank you, Your Honor. Please, the court. I would like to sort of answer Judge Tallman first with regard to Mr. Gorey, my client. Mr. Gorey was not a gang member. There's no evidence he was ever a gang member. There's no evidence he was dealing in drugs. There's absolutely no evidence he was dealing in weapons prior to this. And also, sort of the horse that's out of the barn in this case. Can you tell me, was he solicited first by the CI or was he introduced later by somebody else to the CI or an undercover? He was brought in and introduced by someone else, Your Honor. But he wasn't specifically targeted at the beginning of the investigation? Correct, Your Honor. However, one of the things that has been unmentioned here is that the CI was priming this pump for five months before they started getting into the weapons. Well, priming the pump with a trunk full of knockoff goods. Well, we don't know whether they're – It sounds like this guy was sort of a door-to-door peddler, probably in violation of the Green River Ordinance. I would submit that essentially this was a stash house type of case, but that he was using his trunk instead of a storefront. A stash house? Well, in some of the cases where they've used a storefront in order to do these transactions, this gentleman, the CI, was using his trunk. But how is that different, Mr. Newman, from sending a CI out on the street to see if people will sell him drugs? Well, because he wasn't trying to sell him drugs. At first, he was just trying to introduce himself into the neighborhood. Maybe I'm not making my question clear. Yeah, please. If it's okay for the police to go out and conduct an undercover investigation where they solicit the sale of a contraband item, drugs, what's wrong with going out and initiating an investigation of a sale of a contraband item, illegal firearms? Because the difference in that, Your Honor, in a normal sense where a person says, well, I have money, I'm looking to buy drugs, that's one thing. But here we have a confidential informant who spent five months or five-plus months going out there, dealing with these products. Well, I can't tell you what my client knew was a knockoff or a real Prada purse that he knows is several hundred if not thousands of dollars. He was getting cigarettes in huge volumes from this confidential informant. Now, Your Honors may or may not be aware that cigarettes in these communities, the minority communities, is currency. Currency, yeah. But our cases recognize that in order to establish the persona, the bona fides of the undercover or confidential informant, the government can give them $250,000 in cash to go out and see if he can find a cocaine trafficker who will sell them multi-kilo quantities of cocaine. And we've said that's all part of this dirty game that we play of cops and robbers. In those cases, Your Honor, what we have is we have a C.I. that's under the control of his handler. In this particular case, we have no control of the C.I. by the handler at any time, other than the fact that the C.I. would continually go back to the ATF offices to get more supplies and bring it back. It took five and a half or closer to six months before the handler actually came in to act as an Armenian mafia member. But I don't understand how that's different from somebody establishing that he's really a member of the underworld and therefore can be trusted to engage in a narcotics transaction. I mean, it seems to be all sort of part and parcel of establishing the role, if you want to call it that. Well, I understand establishing the role. I've done a lot of these cases over the years, Your Honor. And the fact is that they never – this establishment of a persona has never, in my experience, been five, five and a half, six months in creating this situation. But also we're painting a very difficult portion here, painting a very broad brush of my client's not a gang member. His only prior was an assault of a plumber who had slashed his mother. And that was a few years earlier. He had no other drug arrests or convictions of any kind whatsoever, other than traffic offenses. If the position of the government is that, well, it's the area that makes it legitimate to go after these people because the area is a gang-infested area, he might as well have gone after Mr. Gorey's grandmother or his mother because they live in the neighborhood. Was the assault conviction a felony? It was, Your Honor. Okay. So he could not possess a firearm on the basis of that conviction. That's correct, Your Honor. But it's also clear, and it was clear in the record, in conversations with the confidential form, Mr. Gorey said, I'm getting all these guns from pawn shops in the Menlo Park area. And then, of course, we're talking about going to Arizona to gun shows and other pawn shops there. What really struck Judge Wright was, and I suggest read exactly what he says in the context. We read the transcript. I'm sure you did. The fact is not one gun was taken off the streets. Not one illicit gun was taken off the streets. All these guns that Mr. Gorey had were taken out of pawn shops and gun shows. And for that, Your Honor, I have about a minute left, was that shocking? Are you saying a criminal street gang could not use a firearm that's otherwise lawfully acquired to engage in another violent crime? Well, in my experience, most street gangs use guns that are stolen and not bought in pawn shops or even gun shows. Maybe there are cases where they have been doing that. I've certainly seen cases where that was true. Well, I'm sure there are, Your Honor. We've got an awful lot of these gang cases. We both have, Your Honor. And the fact is, Your Honor, most of these guns that the gangs have are hidden, they're stolen, they're passed on from one gang member to the other. They like the untraceable firearms with the filed-off serial numbers. With the filed-off serial numbers, and they hide these things under houses, on roofs, and whatever. But the fact is that they don't generally go to a pawn shop to buy a gun. That's an unusual fact. It's a very unusual fact, because usually a gang member is all tatted up, and any pawn shop owner would be really suspicious of some guy coming in to purchase a weapon. But also the fact that they were being paid two, three, four times the value of this gun. The inducement part that bothered Judge Wright. Exactly, Your Honor. You're over time. I'm sorry, Your Honor. Judge Rennick, do you have any questions? So is your complaint about the inducement that the informant didn't negotiate and just paid what your clients were asking for? My client wasn't asking for it, it was what was being offered, Your Honor. And it ended up being a $200 gun, he was getting paid $700, $800, $900 for the gun. But wasn't that his asking price? I don't think there was an asking price. It's not clear from the record as to how the price was established. I think when they brought in the undercover... That made the deal too good to turn down. It was too good to turn down. And the fact is that the undercover agent who came in as an Armenian Mafia member had an unlimited supply of money, Your Honor. We've got your argument. Thank you, Mr. Newman. Thank you, Your Honor. Thank you for my extra time. Very briefly, the features that made Black a difficult case for this court are articulated in Black at page 303. And they were that the government came up with a fiction to justify the crime and went trolling in a neighborhood that was based... trolling in a neighborhood defined only by socioeconomic conditions. Neither of those factors are true here by a long shot. Similarly, Judge Wright expressed his concern... They were trolling in this case in Compton. But they did so based on having seen firearm-related crimes. At ER 18, 106, 228, and 329, it was clear that they saw crime there committed by a particular gang and then targeted the gang. That's not targeting a neighborhood based on it just being a bad neighborhood. That's targeting a gang, having seen that gang committing firearm-related crimes, which I would submit is different from what happened in Black, where the C.I. simply went to a bar that he thought was kind of skeezy and where he might find people interested in a robbery. Could you give me those ER sites again? 18, 106, 228, and 329. The C.I. didn't really put any pressure on any of these defendants, right? That's correct. They came, as a matter of fact, they came to him. That's correct. The C.I. testified that he made it generally known that he was interested in guns. He testified that he never directly solicited and went up to someone he didn't know and say, hey, can you get me a gun? And these defendants were introduced by other defendants after they were already dealing in weapons. When they introduced themselves, they came as, by their own assertions, well-connected, capable gun dealers. On the pawn shop issue, I want to contest the notion that that is so strange, just to make this case that interesting. To be honest, it falls exactly within the core of what the defendants are charged with. They're charged with dealing in firearms without a license. The whole point of that crime is to illegalize the kind of arbitrage in which these defendants were engaged. This isn't an edge case. This isn't an antique dealer who sold a blunderbuss to a friend and didn't realize that there was a licensing requirement. These are people that are, it appears, on purpose, undermining the California rules, both about felons, which they both were. Remind me at what point the agents found out that the guns were actually coming from a pawn shop in Arizona. The record that is before the court here, in December, so the first transaction with these defendants was in October 2015, though it appears they were probably the source of some of Smith's firearms before that. In December of 2015, so several months down the line, the ATF ran a records check and found record of their arrest in Arizona. The first and only reference to a pawn shop and to the particular mechanism isn't until April of 2016, which is right before they were arrested. And so it was later down the line that they found out. If the court has no further questions, the government would submit. Thank you very much. Thank you. This matter is submitted for decision by this court. Thank both sides for your arguments.
judges: Tallman, Nguyen, Bennett